Dana BATES, Plaintiff

v.

James J. MACKAY and Town of Saugus, Defendants

No. CIV.A.03–10629–REK.

United States District Court, D. Massachusetts.

June 10, 2004.

John J. Cloherty, III, Pierce, Davis, Fahey & Perritano, LLP, Boston, MA, for James J. Mackay, Defendant.

Terence E. Coles, James J. Mackay, Harold L. Lichten, Pyle, Rome & Lichten, P.C., Boston, MA, for Dana Bates, Plaintiff.

John J. Davis, Pierce, Davis & Perritano, LLP, Boston, MA, for Town of Saugus, James J. Mackay, Defendants.

## Memorandum and Order

KEETON, Senior District Judge.

### I. Pending Matters

Pending for decision are matters related to the following filings:

(1) Plaintiff's Motion for Summary Judgment and Statement of Undisputed Facts (Docket No. 13, filed February 19, 2004) and Memorandum in Support (Docket No. 14, filed February 19, 2004);

(2) Defendants' Opposition to Summary Judgment and Defendant MacKay's Cross–Motion for Summary Judgment (Docket No. 16, filed March 22, 2004) and Memorandum in Support (Docket No. 17, filed March 22, 2004);

(3) Defendants' Statement of Material Facts in Dispute (Docket No. 18, filed March 22, 2004);

(4) Affidavit of James J. MacKay (Docket No. 19, filed March 22, 2004); and

(5) Plaintiff's Opposition to MacKay's Cross–Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 20, filed April 12, 2004).

### II. Factual and Procedural Background

The plaintiff, Dana Bates, is a detective in the Town of Saugus Police Department, and is the president of the Saugus Police Relief Association ("SPRA"). The SPRA is an organization composed of current and past town police officers; it provides disability and death benefits to its members.

A series of disturbances in late 2002 and early 2003 at nightclubs in Saugus received substantial local media attention. These events were also the subject of discussion at meetings of the Saugus Board of Selectmen. According to Bates, the increased violence was a result, in part, of

decreased police presence; the nightclubs had recently curtailed their practice of hiring police officers to provide security. In response, in late February, 2003, Detective Bates wrote a letter to the editors of three local newspapers. The letter read as follows:

Letter to the editor:

I am the president of the Saugus Police Relief Association. The S.P.R.A. pays disability and death benefits to all the men and woman [sic] of the Saugus Police Department. Although Saugus is a small community when you compare it to the cities and towns which are around us we have had two police officers killed in the line of duty.

We now find ourselves in a serious situation involving some of the nightclubs in town. Years ago many clubs would hire police officers so that the 5 p.m. to 1 a.m. and the 1 a.m. to 9 a.m. divisions would not have to send all the officers to assist in quelling a disturbance. The officers who were there all night could monitor the size of the crowd and not allow any rowdy persons and or persons who were drinking inside the club. We would work hand in hand with the club mangers [sic] to provide a safe environment for those coming to Saugus for the night. That safe environment has changed. We have had several major disturbances where officers have been assaulted. Recently two Saugus Officers had to draw their service weapons because they were in fear of their lives because of an unruly crowd at one of the clubs.

Some of these clubs will tell you they have a security staff. Many times the security staff is part of the problem. If they commit an assault and battery they are subject to arrest. Now we have the problem of all night parties. Although some clubs may monitor the patrons closely what type of person come [sic] out at 3 a.m. to party. Most of these patrons have been drinking all night.

I think the final straw came for me when a club manger [sic] recently refused to open the door for the police to inspect the establishment. This is in clear violation of the law and shows a total lack of respect for the men and women of the Saugus Police Department.

I would hope that the Board of Selectman [sic] would set up a meeting with a panel of members of the Saugus Police Department to address this issue. Hopefully this problem can be resolved and the Town of Saugus can once again be a safe town for its citizens and a safer place to work for its police officers.

Yours Truly,

Detective Dana Bates

President S.P.R.A.

Docket No. 14, ex. E.

On March 4, 2003, defendant Police Chief James J. MacKay issued a letter of reprimand to Bates. The letter stated:

Dear Officer Bates:

You are hereby given a written letter of reprimand for violating the Department's Rules and Regulations as they pertain to the dissemination of official police information to the media.

The Department's Executive Officer has been designated as the Public Relations Officer; he exclusively deals with the media on all Police Department matters. The letter you sent to the Editor of the Lynn Item violates this longstanding order.

A copy of this reprimand will be placed in your personnel file.

James J. MacKay, Chief

Docket No. 14, ex. G.

Bates asserts that his discipline, and the police department regulations, violate his First Amendment right to speak freely about matters of public concern. He filed suit in this court on April 4, 2003, seeking injunctive relief and damages. Bates now moves for summary judgment. Defendant MacKay cross-moves for summary judgment, claiming he is entitled to qualified immunity.

### III. Disposition of the Pending Motions

#### A. Summary Judgment Standard

■ Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. *See* Fed.R.Civ.P. 56. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then the non-moving party must demonstrate that *"every essential element* of its claim or defense is at least trialworthy." *Price v. General Motors Corp.,* 931 F.2d 162, 164 (1st Cir.1991) (italics in original).

A dispute is genuine if it "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997). Facts are "material" if they possess "the capacity to sway the outcome of litigation under the applicable law." *Id.* The facts in genuine dispute must be significantly probative in order for summary judgment to be denied; "conclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Id.*

■ Moreover, "[t]he standards are the same where, as here, both parties have moved for summary judgment." *Bienkowski v. Northeastern Univ.,* 285 F.3d 138, 140 (1st Cir.2002) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335–36 (3d ed. 1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.")).

#### B. First Amendment Analysis

##### 1. Introduction

■ It is commonly observed that a public employee does not relinquish the right under the First Amendment to comment on matters of public interest simply because of his or her employment by the government. *E.g., Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nevertheless, the interests of a state in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. In particular, a government entity has an important interest in promoting the efficient performance of its duties. *O'Connor v. Steeves,* 994 F.2d 905, 912 (1st Cir.1993). The federal courts have developed an extensive body of case law to guide the determination in a given factual setting as to which party's interest should prevail.

■ In a situation in which a government employee alleges that the government unlawfully squelched the employee's speech, a court must engage in a three-part First Amendment inquiry. First, a court must decide whether the speech in-

volves a matter of public concern. Second, it must weigh the First Amendment interests of the plaintiff and the public against the government's interest in functioning efficiently. Third, it must decide whether the protected speech was a substantial or motivating favor in the defendant's action. *Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir. 2004).

## 2. Public Concern

■ The threshold inquiry is whether Bates' speech may be characterized as concerning a matter of public concern. *See Connick*, 461 U.S. at 146, 103 S.Ct. 1684.

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Id.* The defendants argue that Bates' speech was not a matter of public concern.

■ "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. It is not always necessary, however, to examine the form and context of the expression.

> Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the "form and context" of the expression. On the other hand, public-employee speech on a topic which would not necessarily qualify, on the basis of its content alone, as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more

complete *Connick* analysis into the form and context of the public-employee expression, "as revealed by the whole record," with a view to whether the community has in fact manifested a legitimate concern in the internal workings of the particular agency or department of government, and, if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse.

*O'Connor*, 994 F.2d 905, 913–14 (citations omitted). I conclude that Bates' letter related to a topic "clearly a legitimate matter of inherent concern to the electorate." *Id.* A more searching *Connick* analysis, therefore, is unnecessary.

The defendants' argument that Bates' letter did not relate to a matter of public concern is unpersuasive. The defendants admit that Bates' letter presented his public safety concerns related to inadequate security at night clubs. They concede, generally, that public safety is a matter of public concern. They argue, however, that "[p]laintiff's letter to the editor is more properly viewed as a plea for additional staffing and/or overtime and detail assignments for the Saugus police officers." Defendants' Memorandum of Law (Docket No. 17) at 6. But the letter does not explicitly make any of these requests. The letter merely asks that the town Board of Selectmen act on an issue of pressing importance to the community. Contrary to the defendants' assertions, Bates' letter did not relate to the internal operating procedures of the police department—as would be the case, for example, if the letter had addressed an issue that related personally to Bates, such as a dispute between him and his supervisor. It related to a matter of broad public importance. This was a matter to which the opinion of a police officer was of great value to the community. *Cf. Waters v. Churchill*, 511

U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) ("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions.") (plurality opinion).

The cases the defendants cite are distinguishable. In some of the cases the plaintiffs cite, the court held that the speech was not about a matter of public importance because it related directly to the plaintiff's personal interests, and was of minimal public importance. *See Cooper v. Johnson*, 590 F.2d 559, 561 (4th Cir.1979) (considering a letter to the editor written by a former deputy sheriff in Virginia seeking to correct a statement in a local newspaper giving credit for solving a theft to a single officer, and seeking to take partial credit for himself); *Moorer v. Copley Township*, 98 F.Supp.2d 838, 842 (N.D.Ohio 2000) (considering a police officer's open letter criticizing the police chief's decision to send a police officer other than the plaintiff to juvenile training school). In this case, Bates had little personal interest in the subject matter, beyond the interest shared by all police officers in the effective functioning of the police department. And in one of the defendants' cases, the court found that the subject matter *was* of public concern (although the plaintiff was not protected by the First Amendment for other reasons). *See Hopkins v. Dolinger*, 453 F.Supp. 59, 61 (W.D.Va.1978).

Other cases the defendants cite involve letters from police officers criticizing technical decisions that were unlikely to attract public interest. *See Brown v. Trenton*, 867 F.2d 318, 319–20 (6th Cir.1989) (considering a letter signed by six members of the city's Emergency Response Tactical Team ("ERTT") criticizing the police chief's complaints about the costs and difficulties associated with the ERTT program,

and denouncing the mayor for failing to deploy a full contingent of ERTT officers to a high-security event); *Jurgensen v. Fairfax County*, 745 F.2d 868, 871–72 (4th Cir.1984) (considering a police officer's unauthorized release of a "normal administrative operational report" regarding the local Emergency Operations Center (EOC); the report found "nothing sensational," but included the "housekeeping" recommendation that "[a]n immediate increase in experienced personnel or a return to a three or four squad schedule are the only ways EOC can return to a staffing level that is adequate."). In contrast, the subject matter Bates addressed—inadequate security at nightclubs—had already attracted substantial media attention and public engagement. *Cf. Rankin v. McPherson*, 483 U.S. 378, 386, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (considering media attention in the context of the "public concern" inquiry).

In contrast, the decision of the Court of Appeals for the Second Circuit in *Harman v. City of New York*, 140 F.3d 111 (2nd Cir.1998), is directly on point. That case arose out of the beating death of a six-year-old girl, allegedly at the hands of her mother. The situation received intense media scrutiny when it became public that the city's Child Welfare Agency (CWA) had previously received numerous reports about the girl. ABC's World News Tonight produced a story about the incident, in which they interviewed Rosalie Harman, a supervisor at CWA. She told the interviewer, " 'The workers who are considered the best workers are the ones who seem to be able to move cases out quickly.' She also said, 'There are lots of fatalities the press doesn't know anything about.' " *Id.* at 116. The city maintained an executive order under which employees of the CWA (later the Administration for Children's Services ("ACS")) were forbidden to give media interviews without prior approval.

Relying on this policy, the city suspended her. *Id.* Harman brought suit, challenging her suspension and the constitutionality of the policy. *Id.* at 116–17.

The court ruled that the executive order and Harman's suspension were unconstitutional. *Id.* at 124. With respect to the *Connick* inquiry, the court observed that "discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern." *Id.* at 118 (quotation marks, citations, and brackets omitted). The court ruled that the plaintiff's "speech, concerning the priorities and effectiveness of the CWA, is obviously of interest to the public whom the agency serves." Similarly, in this case, I rule that the effectiveness of the Saugus Police Department in addressing what had become an issue of significant importance to the community is of sufficient public concern to pass the threshold established by *Connick.*

The defendants also argue that Bates was not speaking as a citizen, but rather as a detective. For the purposes of this discussion, I assume that Bates has no protected interest in purporting to speak on behalf of the police department without authorization. Nevertheless, no evidence exists suggesting that Bates held his letter out as being written on behalf of the police department. The defendants argue that the letter was on the letterhead of the Saugus Police Relief Association, Inc., and was signed by *Detective* Dana Bates. *See* Letter to the editor (Docket No. 14, ex. 1(E)). But the very name of the Saugus Police Relief Association, *Inc.* indicates that it is a private entity separate from the police department. And Detective Bates signed the letter "Detective Dana Bates, *President S.P.R.A.*" *Id.* (emphasis added). I rule that Bates sent the letter in his private capacity as president of the Saugus

Police Relief Association, and not on behalf of the police department.

### 3. Balancing Test

#### a. Applicability of the *National Treasury Employees Union* Test

Once a plaintiff meets the *Connick* "public concern" threshold, he must show that the First Amendment interests of the speaker and the public outweigh the government's interest in efficient operation. *See Pickering v. Bd. of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). To the extent Bates presents a facial challenge to the police department's news media policy, under *United States v. National Treasury Employees Union,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("NTEU"), the defendants'

> burden here is even greater than it was in *Pickering* and its progeny, which usually involved individual disciplinary actions taken in response to particular government employees' actual speech. Specifically, the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government.

*Id.* at 468, 115 S.Ct. 1003 (quotation marks and citations omitted).

The Saugus Police Department's media policy reads, in relevant part, as follows: "The Chief of Police will act as the official spokesman for the police department in conducting and maintaining an active liaison with the news media." Docket No. 19, ex. A at ¶ 2. One of the responsibilities of the Lieutenant Executive Assistant to the Chief is to act as "Public Relations Officer (is the only person authorized by the Chief to communicate with the media relative to

police matters)." Docket No. 19, ex. C at ¶ 1. Bates' letter of reprimand states, "The Department's Executive Officer has been designated as the Public Relations Officer; he exclusively deals with the media on all Police Department matters." Docket No. 14, ex. G.

 "[T]o prevail on a facial attack the plaintiff must demonstrate that the challenged law either could never be applied in a valid manner or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (quotation marks and citations omitted). The written policies of the Saugus Police Department restrict communication with the media only with respect to "police department matters." Numerous valid applications of this policy exist. A police officer has no right, protected by the First Amendment, to reveal sensitive information about ongoing investigations. *See Harman*, 140 F.3d at 119 ("[N]either the Plaintiffs nor the public has any protected interest in releasing statutorily confidential information.") Moreover, the police department had the right to designate one officer to act as the official media representative. Police officers have no protected right to speak in an official capacity on behalf of the police department. *See Kotwica v. Tucson*, 801 F.2d 1182, 1184 (9th Cir.1986).

Under the second part of the test, a regulation may be struck down on its face only if "the statute is substantially overbroad, which requires the court to find a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* (citations and quotation marks omitted). I rule that none of the written policies listed above is substantially overbroad. The requirement that the Chief of Police act as the "official spokesman" for the police department (Docket No. 19, ex. A at ¶ 2) does not impinge upon the right of police officers to speak *unofficially*. Similarly, the fact that the Lieutenant Executive Assistant to the Chief "is the only person authorized by the Chief to communicate with the media relative to police matters" (Docket No. 19, ex. C at ¶ 2) does not prevent officers from speaking to the media where the Chief's authorization is not required. I conclude that the regulations, as written, are not amenable to a facial challenge.

 In these circumstances, I conclude that Bates' claim that Chief MacKay's letter of reprimand was constitutionally impermissible must be analyzed under the framework established by *Pickering v. Board of Education.*

### b. *Pickering* Factors

 Under *Pickering*, a court must "balance the strength of plaintiff['s] and the public's First Amendment interests against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its public officials." *Mullin v. Fairhaven*, 284 F.3d 31, 37 (1st Cir.2002). A court must consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Substantial interests weigh on both sides. "[L]aw enforcement agencies, as para-military organizations, have been recognized as qualitatively different from other governmental branches; law enforcement employees are 'subject to greater First Amendment restraints than most other citizens.'" *Wagner v. City of Holyoke,* 241 F.Supp.2d 78, 91 (D.Mass.2003) (*quoting McMullen v. Carson,* 754 F.2d 936, 938 (11th Cir.1985)). The defendants argue that the government's interests outweigh Bates' interests for four reasons. They argue, first, that the letter revealed information about ongoing investigations, placing the integrity of those investigations in jeopardy. Second, they state that the letter's complaint of inadequate police staffing "undermin[ed] the mission of the Department by calling into question public confidence in the community." Third, the letter "undermined the authority of the Chief by circumventing the chain of command, and by inviting the Board of Selectmen to convene a meeting outside of the chain of command." Fourth, the letter would create "further problems in the area due to publicizing the alleged shortcomings in police capacity which may be exploited by the criminal element." Docket No. 17 at 12. *See Brasslett v. Cota,* 761 F.2d 827, 844 (holding that relevant factors to consider in the *Pickering* test include "'(1) whether [the allegedly protected activity] was directed against those with whom the plaintiff is in regular contact such that it might impede harmony among co-workers or the ability of supervisors to maintain discipline'"; and "'(2) whether plaintiff's activity has a detrimental impact on those with whom he must maintain personal loyalty and confidence for the fulfillment of his job responsibilities.'") (quoting *McDonough v. Trustees of the University of New Hampshire,* 704 F.2d 780, 784 (1st Cir.1983)) (alteration in original).

Weighing in favor of the plaintiff is his First Amendment right to speak on matters of public concern. Even more important is the public's interest in being well informed on such issues—particularly where, as here, the speaker has special knowledge of the subject matter. *See Wagner,* 241 F.Supp.2d at 93 ("Wagner was uniquely qualified to discuss the problems of Holyoke Police Department; the public discourse was entitled to benefit from his informed perspective."); *see also Pickering,* 391 U.S. at 572, 88 S.Ct. 1731 (valuing the opinion of employees with "informed and definite opinions" about the relevant field). The public had a powerful interest in the benefit of the free exchange of ideas regarding how to address nightclub-related violence, which had recently increased in prevalence.

Bates' subjective motivation is irrelevant to this inquiry. The defendants argue that Bates was not motivated by a public interest; rather, his letter was "a plea for additional staffing and/or overtime and detail assignments for the Saugus police officers." Defendants' Statement of Disputed Facts (Docket No. 18) at ¶ 3. A speaker's motivation is relevant to the *Pickering* balance, but a court accords significantly less weight to the speaker's motivation where the topic is of great public importance. *See Wagner,* 241 F.Supp.2d at 86–87; *cf. O'Connor v. Steeves,* 994 F.2d 905, 912 n.5 (1st Cir.1993) ("*Rankin* suggests that the courts are to proceed to the second-stage *Pickering* inquiry whenever public-employee speech, objectively viewed in the context of broader public disclosure, addresses (with reasonable specificity) an issue or topic implicating 'core' First Amendment concerns."). The defendants have presented no evidence to support the theory that Bates was motivated by personal, rather than public, interest. Indeed, Bates had little to gain per-

sonally. At best, his letter, if successful, would have generated some additional police work, to be spread throughout the police department. Moreover, as explained earlier, the topic of Bates' letter was of central public importance. I conclude that, to the extent Bates was motivated by personal gain, this motivation is outweighed by the public benefit of Bates' letter. In these circumstances, I rule that Bates' subjective motivation is entitled to little weight in the *Pickering* balance.

Evaluating the weight of the factors on both sides, and resolving factual disputes in favor of the defendants, I conclude that Bates had a First Amendment right to send his letter to the editor. The defendants' arguments to the contrary lack merit. *See Brasslett,* 761 F.2d at 845 (" '[O]perational efficiency objections must be real and important before they can serve as a basis for discipline or discharge of a public employee.' ") (quoting *Key v. Rutherford,* 645 F.2d 880, 885 (10th Cir.1981)). First, the defendants' position that the letter jeopardized ongoing investigations is belied by the text of the letter and by evidence submitted by the plaintiff. The letter states, "I think the final straw came for me when a club manger [sic] recently refused to open the door for the police to inspect the establishment. This is in clear violation of the law and shows a total lack of respect for the men and women of the Saugus Police Department." Docket No. 14, ex. E. But this incident was covered, in much greater detail, in *The Saugonian* on February 13, 2003, well before Bates wrote his letter. *See* Docket No. 14, ex. J. Moreover, although the defendants produce police reports related to the incident, demonstrating that an investigation was ongoing, they do not explain how Bates' letter could have interfered with that investigation.

Bates' letter also states, "Recently two Saugus Officers had to draw their service weapons because they were in fear of their lives because of an unruly crowd at one of these clubs." Docket No. 14, ex. E. This incident, too, was reported in a local newspaper, the *Saugus Advertiser. See* Docket No. 14, ex. C. Bates' short, non-specific statement added nothing to the newspaper account. The defendants produce a police incident report related to the arrest of an individual in connection with this incident. They fail, however, to explain how Bates' letter jeopardized this investigation.

Second, the defendants' argument that Bates provided information that could have been useful to criminals is similarly unavailing. Bates did not reveal any factual information that the residents of Saugus— including its criminals—did not already know. What he did provide was his informed opinion, which would be useful to the public in maintaining safety in the community.

Third, the defendants also maintain that Bates' letter had the potential to impair discipline in the police department. But they present no evidence of any impairment in discipline. The harm they augur is, at best, speculative, and at worst, illusory. *Cf. NTEU,* 513 U.S. at 475, 115 S.Ct. 1003 ("[A] 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms.").

Finally, the defendants claim that the letter had the potential to undermine public confidence in the police department. I do not accord significant weight to this argument. If the argument were entitled to substantial consideration, public criticism of the government by its employees would always be suspect. The fact that an employee, speaking out against government policies, has the potential to undermine public confidence in the government

is no reason to discourage such speech. The salutary effect of the speech—the improvement of democratic government—far outweighs any temporary crisis of confidence the speech incurs.

The defendants also suggest that a letter of reprimand is not sufficient to invoke constitutional scrutiny. This argument, however, is disingenuous. In *Brown*, the Sixth Circuit stated that "there has never been a time in the history of the Republic when the United States Supreme Court would have considered the issuance of letters of reprimand *under circumstances of this sort* to be constitutionally impermissible". *Brown v. Trenton*, 867 F.2d 318, 323 (6th Cir.1989) (emphasis added). The reply, however, is that, as explained earlier, the circumstances in this case are not "of [the] sort" considered by the court in *Brown*. Many cases have held that a written reprimand may, in appropriate circumstances, be impermissible as an unconstitutional restraint of free expression. *E.g.*, *Parow v. Kinnon*, 300 F.Supp.2d 256, 270 (D.Mass.2004) (allowing plaintiff's summary judgment motion based on a written reprimand). Bates' reprimand deters Bates as well as other officers from exercising their protected interests in freedom of expression. I rule that the reprimand is sufficiently detrimental to those interests that redress is required.

I conclude that no genuine dispute of material fact exists as to the factors relevant to the *Pickering* analysis. Although the Saugus Police Department has a powerful interest in maintaining discipline among its ranks, the defendants' arguments that Bates' letter had the potential to disrupt the operation of the police department are unsupported by evidence, and are unpersuasive. In these circumstances, I rule that Bates' interest in freedom of expression under applicable law, including the First Amendment, and the interests of the public, outweigh the Saugus Police Department's interest in restraining Bates' speech. I hold that the defendants' discipline of Bates in response to his letter to the editor violated both Bates' protected interests and the protected interests of the public.

**4. Causation**

■ It is beyond genuine dispute that Bates was disciplined because of his letter to the editor. *See* Docket No. 14, ex. 1(G) ("The letter you sent to the Editor of the Lynn Item violates this long standing order."). Although the parties dispute precisely which aspect of the letter led to Bates' discipline, I have concluded that, even crediting the defendants' explanation, the letter of reprimand was impermissible. I conclude, therefore, that Bates' protected speech was a substantial factor in the defendants' decision to discipline him. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In these circumstances, the Order below ALLOWS in part the Plaintiff's Motion for Summary Judgment (Docket No. 13).

**C. Qualified Immunity**

■ Defendant MacKay argues that he is entitled to qualified immunity from damages. Government officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). MacKay's state of mind is irrelevant to this stage of the inquiry; the inquiry is objective. *See id.* at 819, 102 S.Ct. 2727.

■ I conclude that MacKay is entitled to qualified immunity. A reasonable police chief could have believed, based on the

case law, that his conduct was constitutional. When deciding whether a government employee's First Amendment rights are violated, courts are required to draw fine lines. "[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent." *Frazier v. Bailey,* 957 F.2d 920, 931 (1st Cir.1992). In this case, both parties have supplied the court with ample precedent; but none of the cases speaks directly to the precise situation at issue here. In these circumstances, I cannot conclude that a reasonable police chief in MacKay's situation would know that the letter of reprimand violated the First Amendment. I rule, therefore, that Mac-Kay is entitled to qualified immunity from damages.

This conclusion, however, does not entitle MacKay to summary judgment in his favor. The plaintiff may not recover *damages* from MacKay, but injunctive relief is still available. *E.g., Nunez–Soto v. Alvarado,* 956 F.2d 1, 4 (1st Cir.1992) (claim for injunctive relief unaffected by ruling that defendant entitled to qualified immunity). In these circumstances, the Order below ALLOWS MacKay's Cross–Motion for Summary Judgment (Docket No. 16) to the extent that it seeks immunity from damages, but DENIES the motion to the extent that it seeks a dismissal of all claims against him.

## D. Remedies and Municipal Liability

Bates requests an order

(1) instructing Defendants to rescind the March 4, 2003 Letter of Reprimand given to Plaintiff and expunge any reference to said letter from the Plaintiff's personnel file;

(2) barring Defendants from retaliating against or in any way disciplining any police officer who elects to make statements to the press about inadequate security at the nightclubs;

(3) barring Defendants from taking any further action against Plaintiff or any other police officer for speaking to the press about issues of public concern, including security at the nightclubs;

(4) barring Defendants from invoking the rule and regulation barring police officers, including Plaintiff from making statements about all police department matters.

Docket No. 13 at 1–2. He also asks for a trial to assess damages.

I conclude that it is inappropriate to order any relief without providing the defendant the opportunity to oppose Bates' requested relief in light of my rulings in this Memorandum. In addition, I note that a question may exist as to whether the plaintiff is entitled to recover from the Town of Saugus. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In these circumstances, the defendants are directed to propose to the court, by way of motions and supporting memoranda, an appropriate disposition of this case, in light of my rulings above. The defendants' submission must be filed by July 12, 2004. Bates may respond within 21 days after the defendants' filings. These time limits may be extended for good cause with the approval of the court.

### Order

For the foregoing reasons, it is OR-DERED:

(1) Plaintiff's Motion for Summary Judgment (Docket No. 14) is ALLOWED to the extent explained in the foregoing Memorandum.

(2) Defendant MacKay's Cross–Motion for Summary Judgment (Docket No. 16) is ALLOWED to the extent that the plaintiff may not recover monetary damages from defendant MacKay, and it is DENIED in all other respects.

(3) The parties are directed to submit further briefing with respect to appropriate remedies as explained in the foregoing Memorandum.